### READ v. UNITED STATES.

(Court of Appeals of District of Columbia. Submitted October 3, 1923. Reargued May 15, 1924. Decided June 2, 1924.)

#### No. 3971.

1. **Forgery ⊜⟹14—Contention that forged draft had no tendency to defraud held without merit.**

   Where alleged forged draft identified bank of issue and purported to be certified by cashier thereof, a contention that it had no tendency to defraud, as bank's entire corporate name did not appear thereon, *held* without merit.

2. **Forgery ⊜⟹16—Forgery and uttering same instrument are distinct offenses.**

   Under Rev. St. § 1782 (Comp. St. § 10283), forgery and uttering same instrument are distinct offenses.

3. **Statutes ⊜⟹181(1)—Legislative intention governs interpretation.**

   Legislative intention governs in the interpretation of a statute.

4. **Criminal law ⊜⟹564(1)—Evidence held to show forgery was committed in District of Columbia.**

   Evidence showing that forged draft was produced and uttered to, and bore the name of, a real estate firm located in the District of Columbia, *held* to warrant inference that forgery was committed within the District.

5. **Forgery ⊜⟹29(5)—Indictment need not allege name of party intended to be defrauded.**

   An indictment for uttering forged draft under Rev. St. § 1782 (Comp. St. § 10283), need not allege name of person or corporation intended to be defrauded, and defendant was not prejudiced because indictment alleged uttering to persons to whom it was handed, instead of corporation defrauded.

Appeal from the Supreme Court of the District of Columbia.

William J. Read was convicted of forgery, and of uttering a forged draft, and he appeals. Affirmed.

James F. Splain, William E. Leahy, and E. S. Clark, all of Washington, D. C., for appellant.

Peyton Gordon and J. H. Bilbrey, both of Washington, D. C., for the United States.

Before ROBB and VAN ORSDEL, Associate Justices, and SMITH, Judge of the United States Court of Customs Appeals.

ROBB, Associate Justice. Defendant, appellant here, was convicted under three counts, the first of which charged forgery, the second ut-

tering to Harry K. Boss, and the third uttering to John Poole. The material facts, as developed by the evidence, are as follows:

Defendant, representing himself as C. B. Morse, from the state of Washington, applied to the firm of Boss & Phelps, Inc., real estate agents of this District, for the purchase of a detached home, to cost about $20,000. Mr. Buell, of the firm, together with the defendant and Mr. Boss, inspected a number of properties, and finally one was found that apparently satisfied the defendant, who stated that his wife really was the one to be satisfied, and that, as she was out of town, he would write her a description of the house, and, if it pleased her, he then would be in a position to talk business. Upon returning to the office, defendant said he was going to Boston, but would be back in a few days, and, as he was expecting mail, would like the privilege of having it sent to the office of the firm during his absence. This privilege was granted, and in about a week defendant came into the office, informing Mr. Boss that he had just returned to the city. Later that day, in company with Mr. Boss and Mr. Buell, defendant inspected other properties that meanwhile had been listed. Finally defendant expressed the opinion that the house tentatively selected on the previous occasion more nearly met his requirements, and that he was quite sure it would meet with the approval of his wife. Returning to the office about 6 o'clock, defendant announced that he would not pay more than $19,000 for this house, and the owner, upon being communicated with, agreed to sell at that figure. Defendant stated he would make a deposit of $500. A contract embodying the terms of sale then was drawn up, specifying all cash, with balance to be paid as soon as title could be searched and deeds delivered. At this stage, Mr. Boss informed defendant that mail had been received in his absence and handed him several letters, some of which bore postmarks indicating they had been mailed in Boston and New York. Defendant looked over these letters and began opening them. A paper fell from one of the letters and was picked up by the defendant, who then said "that they had made a mistake." The paper to which he referred purported to be a cashier's draft for $10,000. This was introduced in evidence and is in the following form:

"No. 871006.             Aberdeen, Wash., July 13, 1912.    191

       "98–31    United States National Bank.          $10,000.00
"Pay to the order of Boss & Phelps $10,000, ten thousand dollars.    "To First National Bank, Seattle, Wash.

                        "R. C. Vandevort, Cashier."

Defendant stated that he had asked the bank to send him a draft for $10,000 in care of Boss & Phelps, but that instead the draft had been made payable to Boss & Phelps. Defendant handed the draft to Mr. Boss, who looked it over and said it would make no difference; that he would be glad to indorse it, so that defendant could get the cash and pay for the house. Thereupon Mr. Boss placed the indorsement, "Boss & Phelps, Incorporated, by Harry K. Boss, Pres.," upon the back of the draft, and offered to put the draft in the firm's safe over night, as the banks then were closed, and "it was quite a large amount to carry around." Defendant said "he would just put it in his pocket, but that he did not have any bank in town with which

he did business." Mr. Boss stated that he would be very glad to introduce him in the morning at the bank where the firm had its account. This suggestion was agreeable to the defendant, who appeared the following morning and accompanied Mr. Boss to the Commercial National Bank, where he was introduced to Mr. Poole, the then cashier, as the purchaser of a dwelling and as desirious of opening a bank account. Mr. Poole inquired as to defendant's business address, and was informed that he had none as he had just come from the state of Washington. Defendant then deposited the draft and was given a passbook, showing a credit of $10,000, and a check book. Nothing more was heard from defendant until July 25th, when he called Mr. Boss on the telephone, stating that he was telephoning from Baltimore, and inquiring "how the deal was coming along." On being informed that "everything was all right," defendant said he would see him again in a few days. A little later Mr. Boss learned that the draft was a forgery, but before this discovery was made defendant had withdrawn the amount to his credit in the bank, except $200.

Mr. R. C. Vandervort testified that in July of 1912 he was "cashier of the United States National Bank, which is located at Aberdeen, in the state of Washington"; that he did not sign the draft, although "the signature 'R. C. Vandervort' resembles his signature very much"; that at the time his bank had no such account as C. B. Morse; that he personally did not know whether the correct corporate name of the bank at Aberdeen was "United States National Bank" or "the United States National Bank at Aberdeen." Thereupon it was stipulated that the correct corporate name of the bank at Aberdeen was "the United States National Bank of Aberdeen."

[1] The first contention on behalf of the defendant is that, if any crime was committed, it was that of false pretenses. It is argued that, because the entire corporate name of the bank issuing it does not appear thereon, the instrument had no legal efficacy, and therefore had no tendency to defraud. In U. S. v. Turner, 7 Pet. 132, 8 L. Ed. 633, an indictment for forgery and attempt to pass, the counterfeit bill purported to be issued by the President, Directors, and Company of the Bank of the United States, was signed with the name of John Huske, who was not president of the Bank of the United States, but was president of the office of discount and deposit in that bank, and countersigned with the name of John W. Sanford, who was not the cashier of the Bank of the United States, but cashier of the office of discount and deposit therein. After stating that the bill "purports on its face to be signed by persons who are respectively president and cashier of the bank," the court said:

"It could not be presumed that persons in general would be cognizant of the fact who, at particular periods, were the president and cashier of the bank. They were officers liable to be removed at the pleasure of the directors, and the times of their appointment or removal, or even their names, could not ordinarily be within the knowledge of the body of the citizens. The public mischief would be equally great, whether the names were those of the genuine officers, or of fictitious or unauthorized persons; and ordinary diligence could not protect them against imposition. * * * Nor is it any answer to the charge of forgery that the instrument is not available, by reason of some collateral objection not appearing upon the face of it."

In Neff v. U. S., 165 Fed. 273, 279, 91 C. C. A. 241, 247, the rule is stated as follows:

"If the instrument or affidavit is apparently valid on its face, it is sufficient upon which to base a conviction of the offense, although collateral or extrinsic facts may exist that would render it void if genuine."

In State v. Johnson and Johnson, 26 Iowa, 407, 417 (96 Am. Dec. 158), the court said:

"It must be borne in mind that it is not necessary that the instrument shall have actual legal efficacy, but it is sufficient that, if genuine, it might apparently have such efficacy, or serve as the foundation of a legal liability, and, if it might be taken as legal proof, it would have such apparent efficacy. True it is, there can be no forgery if the paper is invalid on its face, for it can then have no legal tendency to effect a fraud. If its invalidity, however, is to be made out by extrinsic facts, it may be legally capable of effecting a fraud, and the party making the same be punished."

See, also, State v. Sherwood, 90 Iowa, 550, 58 N. W. 911, 48 Am. St. Rep. 461, and White v. Wagar, 185 Ill. 195, 57 N. E. 26, 50 L. R. A. 60.

Tested by the rule announced in the foregoing cases, there can be no doubt that the draft in question, if genuine, would have possessed legal efficacy. It identified the bank of issue as of Aberdeen, Wash., and purported to be certified by the person occupying the position of cashier. When it is remembered that the cashier himself did not know whether the correct corporate name was "United States National Bank," or "the United States National Bank of Aberdeen," it is evident that a draft issued under either title would be calculated to deceive.

[2, 3] It is next contended that the forging and uttering constituted a single offense, and that it was error for the court to sentence the defendant under each of the three counts of the indictment; the total sentence being for 30 years. The indictment is based upon section 843 of the Code, which declares that:

"Whoever, with intent to defraud or injure another, falsely makes or alters any writing of a public or private nature, which might operate to the prejudice of another, or passes, utters, or publishes, or attempts to pass, utter, or publish as true and genuine, * * * with the intent to defraud or prejudice the right of another, shall be imprisoned for not less than one year nor more than ten years."

This statute is in the disjunctive, as was the statute involved in Burton v. U. S., 202 U. S. 344, 26 Sup. Ct. 688, 50 L. Ed. 1057, 6 Ann. Cas. 362. That case involved a prosecution under section 1782, R. S. (Comp. St. § 10283) providing in part that:

"No Senator * * * shall receive or agree to receive any compensation whatever, directly or indirectly, for any services rendered or to be rendered." etc.

The court said:

"Another point made by the defendant is that he could not legally be indicted for two separate offenses, one for agreeing to receive compensation in violation of the statute, and the other for receiving such compensation. This is an erroneous interpretation of the statute, and does violence to its words. It was certainly competent for Congress to make the agreement to receive, as well as the receiving of, the forbidden compensation separate, distinct of-

fenses. * * * But Congress intended to place its condemnation upon each distinct, separate part of every transaction coming within the mischiefs intended to be reached and remedied. Therefore an agreement to receive compensation was made an offense. So the receiving of compensation in violation of the statute, whether pursuant to a previous agreement or not, was made another and separate offense. There is, in our judgment, no escape from this interpretation consistently with the established rule that the intention of the legislature must govern in the interpretation of a statute."

The present case, in our view, falls within the rule announced in the Burton Case. Congress has declared it an offense falsely to make or alter, with intent to defraud, any writing of a public or private nature which might operate to the prejudice of another. The offense thus denounced is complete, even though the instrument never is uttered. When it is uttered, another and distinct offense is committed, and a second uttering, of course, constitutes still another offense. In Frisby v. U. S., 38 App. D. C. 27, the question was not directly involved, and the Burton Case was not brought to our attention.

[4] It is next contended that there is no evidence that the forgery was committed in the District of Columbia. The instrument bore the name of the real estate firm with which defendant was negotiating in the District, to which firm defendant had been referred by another local real estate dealer. The evidence, therefore, fully justified the inference that the forgery was committed in this District, where the instrument was produced and uttered. Com. v. Perris, 108 Mass. 1; State v. Willard, 228 Mo. 328, 128 S. W. 749; People v. Cotton, 250 Ill. 338, 95 N. E. 283; Lindsey v. State, 38 Ohio St. 507; State v. Blanchard, 74 Iowa, 628, 38 N. W. 519; Johnson v. State, 35 Ala. 370; State v. Forbes, 75 N. H. 306, 73 Atl. 929, Ann. Cas. 1912A, 302.

[5] Finally, it is contended that the draft was not uttered to Boss & Poole, but to Boss & Phelps and the Commercial National Bank. It is urged that it was the two corporations in fact defrauded, and therefore that the uttering could not have been to Boss & Poole. The indictment does not allege the persons or corporations intended to be defrauded, nor was such an allegation necessary under the terms of our statute, which require nothing more than a general intent to defraud. See State v. Weaver, 149 Iowa, 403, 128 N. W. 559, 31 L. R. A. (N. S.) 1046, Ann. Cas. 1912C, 1137; Snow v. State, 85 Ark. 203, 107 S. W. 980, 122 Am. St. Rep. 23; State v. Tingler, 32 W. Va., 546, 9 S. E. 935, 25 Am. St. Rep. 830; Com. v. Butterick, 100 Mass. 12, 97 Am. Dec. 65; 12 R. C. L. 155, 156. The proof conformed to the allegations of the indictment. The draft actually was passed to the individuals named, and it is immaterial here that one of the corporations may have been the actual victim of the fraud. The defendant was in no way prejudiced, for he was fully advised of what he was required to meet. In other words, the offense was set forth with sufficient particularity as not only to preclude the possibility of surprise, but to enable the defendant to plead the conviction obtained thereunder in bar of a subsequent conviction for the same offense.

The judgment is affirmed.

Affirmed.

Further motion for reargument denied July 1, 1924. Petition for rehearing and certiorari denied October 11, 1924.