STATE v. ANDREW BRINKLEY, Appellant.—No. 39484.—189 S. W. (2d) 314.

Division Two, September 4, 1945.

338

*Ivan H. Light* for appellant.

340

342

*J. E. Taylor*, Attorney General, and *Aubrey R. Hammett, Jr.*, Assistant Attorney General, for respondent.

 ELLISON, P. J.—The appellant was convicted in the circuit court of the City of St. Louis of perjury in violation of Sec. 4272;[1] and the maximum punishment of seven years imprisonment in the penitentiary was assessed by the jury under Sec. 4273(3) and the habitual criminal statutes, Secs. 4854(2) and 4855. The information charged he testified falsely under oath before a grand jury during the September term, 1942, of said court, that Rino Mittino and others of the police force of the city had beaten him and Edward Melendes on July 25, 1942, in the Eleventh District police station. Melendes died. Judge Russell of the circuit bench of the city became interested in the matter. There were several grand jury investigations, and the proceedings became a cause célébre much discussed in the press. Appellant did not testify at his trial.

The record is long, containing 1626 pages. Over 300 contentions of error were made in the bill of exceptions, and there are more than 100 assignments of error in appellant's brief. Counsel for the appellant, who was appointed to defend him below as a poor person, has followed the case here. His original and "Supplemental" briefs, taken together, and the Attorney General's brief for the State, both are much longer than our Rule 108(d) permits, (though it must be conceded the Attorney General was driven to his violation of the rule by the undue length of the adversary briefs). Appellant's main brief further violates Rule 108 (a)(1), which requires "a fair and concise statement of the facts without argument." Nevertheless, it would be our duty under the statute, Sec. 4150, to review the record and render judgment thereon even if appellant had filed no brief. So we shall consider the briefs as far as they are of assistance.

██ The first assignments of error to be considered, in logical order, are based on the following facts. Originally the appellant was prosecuted first by an indictment and then by an information, both of which were dismissed. Neither of these charged appellant under the habitual criminal statutes. But while the information was pending he was accorded a preliminary hearing and held for trial. Thereafter that information was dismissed and the present information filed, which does incorporate the habitual criminal charge. But no new preliminary hearing was held. About two weeks later appellant was arraigned and pleaded not guilty. Following that and before the trial he filed a motion to quash the information, and a supplemental motion to quash. Both of these were overruled on their filing

[1]References to our statutes are to R. S. 1939, and same section numbers in Mo., R. S. A., unless otherwise shown. Italics in quotations are ours unless otherwise indicated.

dates. On March 13, 1944, at the beginning of the trial, a motion to strike the information was filed and overruled.

Two of the grounds in this last named motion to strike were that the evidence at the preliminary hearing was insufficient to warrant the magistrate in holding him for trial. Another was that no evidence was offered on the habitual criminal charge at the preliminary hearing. Amplifying this last ground, appellant now contends he could not be legally convicted under the second information, because the habitual criminal issue, first tendered therein, was not considered at his preliminary hearing based on the first information.

We think counsel has misconceived the law. To say the least, it was irregular for the original information to be filed before the preliminary hearing. The statute, Sec. 3893, expressly provides that no prosecuting or circuit attorney shall *file* an information charging a felony until the accused shall *first* have been accorded the right of a preliminary examination. State v. McKinley, 341 Mo. 1186, 1188-9, 111 S. W. (2d) 115, 117(2). Furthermore, the magistrate would have had no jurisdiction to pass on the habitual charge even if it had been included in the first information. The sole purpose of these preliminary proceedings is to determine whether a felony has been committed; whether there is probable cause to believe the accused is guilty thereof; and whether he shall be bound over or committed to jail *for* trial. Secs. 3873, 3876, 3877. The magistrate does not determine his guilt or assess the punishment. That can be done only at a trial in the circuit court based on an indictment or information. Secs. 3891, 3892.

The case which appellant cites, State v. Long, 324 Mo. 205, 209-10, 22 S. W. (2d) 809, 811(2) is authority against him instead of for him. There, the accused was charged with a felony and waived preliminary hearing. Later an amended information was filed adding the habitual criminal charge, and the accused was denied a preliminary hearing. Appellant construes that case to mean that if the accused there had not originally waived the *right* to a preliminary hearing, he would have been entitled to a new one in view of the added charge in the new information. But the decision holds the opposite, declaring the habitual criminal charge merely aggravated the punishment for the crime, and did not change its nature, or entitle him to a preliminary hearing, or put him in double jeopardy.

There is no merit in appellant's motion to strike, for another reason which applies to all the grounds therein. As stated above, after the preliminary hearing and the filing of the second information in this case, appellant was arraigned and entered a plea thereto of not guilty. This waived not only defects in the preliminary hearing, but even

the failure to hold one at all.[2] Some of the cases say such waiver occurs when the defendant pleads the general issue *and* goes to trial. State v. Thomas, 353 Mo. 345, 182 S. W. (2d) 534, 538(3). Going to trial does, perhaps, make the waiver stronger, but it is not essential. The appellant here did not withdraw his plea of not guilty, as was done in State v. McNeal, 304 Mo. 119, 262 S. W. 1025. On the contrary, after his motions were overruled, ▇▇▇ he stood on his previous plea of not guilty and went through the trial on the merits relying thereon. These assignments are overruled.

After the motion to strike out the second information had been overruled, appellant refiled and presented his original and supplemental motions to quash it. The first of these assailed the information on the ground that the allegations thereof invoking the habitual criminal statutes were irrelevant, incompetent and insufficient. We reserve discussion of that point until we come to it on the merits. Another ground was that the information was ambiguous; and did not show that the alleged false testimony given by appellant before the grand jury was material to the issue under investigation. We reserve that point also, for discussion presently.

▇ Another ground urged was that the information was duplicitous and multifarious because it joined four alleged perjured statements of the appellant in one count. They concerned beatings of the appellant and/or Melendes by the police at the Eleventh District police station in St. Louis on July 25, 1942. We are unable to sustain this contention. The alleged statements were made under one oath in a single grand jury proceeding where the alleged issue under investigation was whether the appellant and Melendes had been beaten by the St. Louis police at the time and place specified.[3]

▇ The supplemental motion to quash asserts no perjury can be predicated upon the alleged false testimony of the appellant before the grand jury for the September term, 1942, of the St. Louis circuit court of which Erastus Wells was foreman, because that grand jury was discharged before it had completed its investigation of the instant and other matters submitted to it, and before the expiration of its normal life. Thereupon another grand jury was called to serve out that period, and still other grand juries were called for subsequent terms, until finally (it is alleged) the appellant purged himself of the asserted perjury, if any, before a grand jury for the June term, 1943.

---

[2]Ex parte George McLaughlin, 210 Mo. 657, 663, 109 S. W. 626, 627(4); State v. Ferguson, 278 Mo. 119, 129(2), 212 S. W. 339, 341(3); State v. Langford, 293 Mo. 436, 443, 240 S. W. 167, 169(5); State v. McKinley, supra, 341 Mo. 1. c. 1189, 111 S. W. (2d) 1. c, 117(3); State v. Neal, 350 Mo. 1002, 1012, 169 S. W. (2d) 686, 692(7).

[3]41 Am. Jur. sec. 47, p. 27; 48 C. J. sec. 137, p. 885; State v. Taylor, 202 Mo. 1, 5, 100 S. W. 41, 42-3; State v. Gordon, 196 Mo. 185, 198, 95 S. W. 420, 424(5).

Appellant's contention is that by the premature discharge of the September, 1942 Wells grand jury he was deprived of the opportunity to retract his alleged perjuries before that jury. On this novel point appellant refers us to 48 C. J. sec. 22, p. 828. The four decisions there cited merely hold that if the accused *does* correct his false testimony before the case in which he gave it has been submitted, the law will not treat it as perjury. But we know of no decision holding the tribunal must remain open for any particular length of time to give him an opportunity to do that. And there are other facts reflecting on this contention. Appellant does not rely on the fact that he purged himself of the perjury. On the contrary he asserts in his brief that what he said before the grand jury in June, 1943, is incompetent and privileged in this case; and that it was excluded on that ground. Furthermore, he vigorously maintains that his alleged false testimony was true and is shown by the record to be true. This assignment is overruled.

The next assignments to be considered assert the information was fatally insufficient because it alleged the question under investigation by the grand jury was whether *certain police officers and detectives* of the city had beaten the appellant and Melendes; whereas appellant's sworn testimony before the grand jury, as set out in the further allegations of the information, did not say he and Melendes had been beaten by police officers or detectives, but only by *individual* persons. For this reason the brief contends his pleaded testimony was not material to the issue, in consequence of which the information would not support the charge of perjury. The allegations of the information with respect to the testimony that appellant gave before the grand jury are:

(1) that on July 25, 1942, "one Rino Mittino" took him (appellant) and Melendes "downstairs" at the Eleventh District police station where he was knocked down and pounded in the face; (2) that on the same date and at the same place "said Rino Mittino and others" took him and Melendes back "upstairs", where he saw "Rino Mittino" hit Melendes with a pistol and kick him about the stomach and ribs; and that said Rino did the "same thing" to him (appellant); (3) that on the same date "two of the men who arrested him" knocked him out with a pistol in a cell; (4) that on the same date he and Melendes were taken back "downstairs" in said station, and that is where "they" knocked Melendes down five times with a pistol. (This fourth charge of perjury was not submitted to the jury, and need not be further considered.)

The foregoing assignments are followed by specific charges that none of these assaults were committed by the persons charged, or occurred at all; that appellant's said testimony was knowingly, maliciously, feloniously, wilfully, deliberately and corruptly false;

and was material to the issue before the grand jury, to wit: "whether the said Rino Mittino or *other* police officers, detectives or employees" of said city had assaulted and beaten him (appellant) and Melendes. This last allegation necessarily implies Mittino was *one* of the officers, detectives or employees of the city. Allegation (3) above, states that appellant was knocked out with a pistol in a cell by "two of the men who arrested him." And ordinarily the only person who could make an arrest would be a peace officer.[4] So we think these assignments are not well made.

But even if the foregoing conclusions be incorrect, it does not by any means follow that the information was fatally defective. Although the issue under investigation by the grand jury was whether the appellant and Melendes had been beaten by police officers; and notwithstanding it be conceded the pleaded testimony of Melendes did not clearly describe his assailants as police officers; yet it does unequivocally state that the persons mentioned committed the assaults, which facts the information alleges were untrue and material to the investigation.

The general rule in this state and elsewhere is that perjured testimony need not bear directly upon the main issue, or cover the whole subject of inquiry. It is sufficient if the testimony be collaterally, corroboratively or circumstantially material, and have a legitimate tendency to prove or disprove any material fact pertinent to the inquiry.[5] The identity of the assailants and the facts of the assaults being so far disclosed by the pleaded false testimony that its materiality could be shown by other testimony, the information is good enough though inartificially drawn.[6] Sec. 4278 dispenses with the common law requirement, and provides it shall be sufficient if the information set forth "that the matter or testimony alleged to be false was material to a certain matter or issue named, without setting forth the particular facts showing its materiality."[7]

The next assignments are that the information omitted necessary innuendoes, which should have been inserted to show that Mittino was a police officer or detective; and to explain the meaning of the words "downstairs", "upstairs", "same thing", and "and

[4]5 C. J. sec. 10, p. 389; sec. 15, p. 391; sec. 17, p. 393; sec. 24, p. 396; sec. 28, p. 398; 4 Am. Jur., sec. 17, p. 13; secs. 21, 22, p. 15; sec. 24, p. 17; Pandjiris v. Hartman, 196 Mo. 539, 546-7, 94 S. W. 270, 272.

[5]48 C. J. sec. 34, p. 833; sec. 128, p. 870; sec. 147, p. 889; 41 Am. Jur. sec. 13, p. 9; State v. Jennings, 278 Mo. 544, 552(3), 213 S. W. 421, 423.(3); State v. Stegall, 318 Mo. 643, 646, 300 S. W. 714, 715(1).

[6]48 C. J. sec. 156, p. 894; sec. 164, p. 899; 41 Am. Jur. sec. 60, p. 33; State v. Hardiman, 277 Mo. 229, 233, 209 S. W. 879, 880(1).

[7]48 C. J., sec. 128, p. 878, 41 Am. Jur. sec. 44, p. 25; State v. Martin, 317 Mo. 313, 318(3), 295 S. W. 543, 545(4); State v. Ruddy, 287 Mo. 52, 57-8, 228 S. W. 760, 761(1).

354

others''. On this point appellant's brief cites three authorities.[8] Of these, the Washburn text states that when the assignment of perjury in an information is broader than the false statement of the accused pleaded therein, and thereby raises a doubt whether the statement comes within the charge, the discrepancy may and must be supplied by innuendo. The Faulkner case holds an information should inform the accused wherein and to what extent his alleged statements were false. And in the Day case the indictment did contain three innuendoes.

What we have said in the second, third and fourth preceding paragraphs disposes of appellant's contention respecting the necessity for an innuendo stating Mittino was a police officer. And appellant, himself, has swept away two of the other contentions by stating repeatedly in his brief that whether the beatings were administered upstairs or downstairs were immaterial details. Moreover, the meaning of the words "same thing" in allegation (2) is plain. It states Mittino hit Melendes with a pistol and kicked him in the stomach and ribs; and did the same thing to him ▆▆ (appellant). The words "and others" in the same allegation mean, of course, persons other than Mittino. Sec. 3952 provides no information shall be deemed invalid for any defect or imperfection of the kind mentioned in the statute, which does not tend to prejudice the substantial rights of the defendant on the merits. There had been a preliminary hearing nearly five months before the trial. The issues were clear at the trial. Appellant was not misled. These assignments are overruled.

▆▆ Another assignment made is that parts of appellant's testimony before the grand jury were not alleged by the information to be false. Thus, allegation (1) charges that he swore Mittino took him *and* Melendes downstairs; whereas the information does not deny that Mittino took Melendes downstairs. And allegation (2) charges Mittino and others took appellant *and* Melendes back upstairs; whereas the information does not deny that Mittino took Melendes back upstairs. And allegation (3) charges that two of the men who arrested appellant knocked him out with a pistol in a cell; whereas the information does not deny it but rather affirms it in an attempted denial, which states that "two of the men who arrested him . . . and neither one of them, knocked him , . . out with a pistol."

In our opinion these deficiencies do not vitiate the information. As we have just said, appellant's brief declares that whether the victims of the assaults were taken upstairs or downstairs are immaterial details. The essential thing is that they were placed where the assaults occurred. Sec. 3952 declares that an information shall not be invalidated for want of an allegation of the place of any

---

[8]2 Washburn's Crim. Law (12 Ed.) sec. 1569, p. 1827; State v. Faulkner, 175 Mo. 546, 600-2, 75 S. W. 116, 133-4; State v. Day, 100 Mo. 242, 245-6, 12 S. W. 365.

material fact when that place has once been stated therein. And as to the repugnance in allegation (3); the same statute prescribes the same rule for informations, as to "any surplusage or repugnant allegation, when there is sufficient matter alleged to indicate the crime and person charged." The clear intent of the allegation was to deny that the assault was committed by both or either of the two men mentioned therein.

The next basic assignments maintain the State's evidence at the trial was insufficient to support the verdict. The undisputed evidence shows that in the early morning of July 25, 1942, about 2:45 A. M.. the appellant, Melendes and a man named Buckshot were arrested as they emerged from the Prize Ring Night Club in St. Louis by six police officers: detectives Mittino and Rung, sergeant Abbott, and officers Hinch, Pratte and Sullivan. The arrest was made on a charge that the three men had strong-armed and robbed one Glen McCowen at the night club. They were taken to the Eleventh District police station in a patrol wagon, arriving there about 3 A. M., and were put in separate cells. The asserted beatings of appellant and Melendes occurred between that time and 7 A. M., both upstairs in the offices and cell room and downstairs in the basement.

The alleged false testimony of appellant before the first September term, 1942, grand jury concerning these assaults was narrated by Erastus Wells, foreman of that grand jury and by Fred Rubenstein a member thereof. We shall come to that presently. The point first to be considered is that both Mr. Wells and Mr. Rubenstein said the grand jury at the time was investigating "the Melendes case," namely the charge that Melendes had been fatally assaulted by police officers. On cross-examination Wells said they were not investigating whether appellant had been assaulted. For that reason, appellant insists the testimony of Messrs. Wells and Rubenstein bearing on his false testimony before the grand jury concerning the assaults committed on *himself*, was immaterial to the issue and cannot be considered.

We do not agree. The assaults on both men were inseparably connected and a part of the res gestae. They had been arrested together for the same alleged crime; taken to the police station together; and allegedly beaten together or alternately. The purpose of the alleged assaults was to extort from appellant and Melendes confessions of their guilt of the robbery charged, and to play the story of one against that of the other. There was a common motive. We have already cited in marginal notes 5 and 6 authorities holding that in a prosecution for perjury evidence is material, even though only collateral, if it has a legitimate tendency to prove the ultimate fact. And it is well established that proof of other crimes may be admitted when they are a part of the same transaction. There are so many decisions on that point that we need cite them only as they appear in 9 West's

Mo. Dig., sec. 365, p. 167. See also, in particular, 41 Am. Jur., sec. 60, p. 32; and State v. Gordon, supra, 196 Mo. 185, 199, 95 S. W. 420, 425(10).

Now returning to the testimony of foreman Wells and juror Rubenstein about appellant's false swearing before the grand jury concerning the assaults inflicted on him and Melendes. Mr. Wells frequently qualified his testimony by such expressions as "as I recall", or "as I recollect." But that did not rob it of probative value, though it affected its weight. 23 C. J. sec. 1774, p. 34; 70 C. J. sec. 116, p. 88; 20 Am. Jur. sec. 768, p. 639, sec. 1178, p. 1028. In Masonic Home v. Windsor, 338 Mo. 877, 882, 92 S. W. (2d) 713, 716(3), cited by appellant the witness merely stated his "impressions." In Armstrong v. Croy (Mo. App.), 176 S. W. (2d) 852, he largely stated opinions. But we do not agree the qualification "if I am not mistaken" would destroy a witness' testimony. See Irons v. Am. Ry. Ex. Co., 318 Mo. 318, 335-6, 300 S. W. 283, 290-1 (11, 12).

However, our review of the testimony of these two State's witnesses must be confined to the first, second and third assignments of perjury in the information, which alone were submitted to the jury. These, as will be remembered, were: (1) that Mittino took both prisoners downstairs, where appellant was knocked down and pounded in the face; (2) that Mittino and others brought both prisoners back upstairs (the place of the assault not being further specified) where Mittino hit Melendes with a pistol and kicked him in the stomach and ribs, and did the same thing to appellant; (3) that two of the men who arrested him (appellant) knocked him out with a pistol in a cell (this would have been upstairs where the cells were). So we leave out of consideration any testimony from Wells and Rubenstein about what happened to either or both of the prisoners on a second trip downstairs, as alleged in the fourth assignment in the information.

Corresponding with the first charge of perjury, Wells quoted appellant as saying he and Melendes were taken downstairs and knocked down by "police officers", but did not include the charged fact that he was pounded in the face. Neither did he, in the beginning, say Mittino committed this assault. But later in his direct examination he stated generally that Mittino was the only officer named in connection with "these" alleged beatings, though others were described by size, etc. Rubenstein's testimony agreed that appellant swore "somebody" hit him and knocked him down and kicked him at the foot of the stairs.

On the second charge—that Mittino and others took both prisoners back upstairs where he hit them with a pistol and kicked them in the stomach and ribs. Rubenstein related that appellant testified "they brought him upstairs in the front office and set him down in one chair and Melendes in the other, and one of the officers struck Melendes with a gun and knocked him out of the chair and kicked

him, and then the same to him.'' Mittino did that. Wells remembered the described assaults but at first couldn't remember where appellant located them. Later he said they occurred downstairs. On the third charge of perjury—that two of the arresting officers knocked appellant out with a pistol in a cell. Wells said appellant swore he was knocked down in a cell with a pistol. Rubenstein quoted appellant as saying that another ''tall lanky fellow'' took him upstairs and beat him, and when he locked him up in his cell he hit him with a gun and knocked him out.

While there is not detailed agreement in the testimony of Wells and Rubenstein we think there was sufficient evidence to take the case to the jury on the issue whether appellant gave testimony before the grand jury substantially as alleged in the first, second and third assignments in the information. The evidence is hazy in identifying the offending officers, except Mittino. The descriptions of the others might have fitted Mittino or Rung, especially the latter. Also, there is not complete agreement as to the place of the assault charged in the second assignment in the information. But we reach the conclusion stated above particularly because appellant does not deny but affirms that they occurred.[9] He says in his brief: ''That defendant told that grand jury that the police beat him and Melendes is certain. We not only admit but assert it. It was true.'' He also attempted to prove that the widow and children of Melendes had brought a civil suit against officers Mittino, Rung and Bauer for his wrongful death.

Next as to the State's evidence to prove that appellant's testimony before the grand jury was false. This evidence came, mainly from the above mentioned officers Mittino and Rung, who made the arrest, and officer Bauer, who came to the police station some time after the two prisoners had been brought there. Desk sergeant O'Day also was produced on certain matters having to do with the record of arrest, but he was not questioned or cross-examined about the assaults. Sergeant Abbott was called by the State in rebuttal and surrebuttal and questioned about a certain photograph and police report. He was not cross-examined on rebuttal about the assaults; and when an effort was made to do it on surrebuttal the questions were ruled out on the ground that they came too late.

Officers Hinch, Pratte and Sullivan, who participated in the arrest and were present during part of the questioning of appellant and Melendes, were not called as witnesses. It seems that officers Pratte and Sullivan were in military service at the time of the trial, but it was shown that officer Hinch had been in the court room sometime during the trial. The further fact was developed that during the time of the alleged assaults the following were at the station but did

---

[9] 20 Am. Jur. sec. 1229, p. 1082; 16 C. J. sec. 1248, p. 629; 22 C. J. S. sec. 733, p. 1254; State v. Kimbrough, 350 Mo. 609, 617, 166 S. W. (2d) 1077, 1082(8).

not testify: Sergeant Myers, in command; Joe Braudrick, turnkey, who ordinarily opens the cell doors and keeps a record of it; the telephone boy; and the police clerk. Braudrick had been in court during some of the trial. The room arrangement of the police station was so compact that if the assaults had been committed they would probably have been seen or heard by these persons.

The testimony of Mittino, Rung and Bauer, while not agreeing always on the "time schedule" did agree on the sequence of events, and pretty much on the persons present at the various times. Under their testimony, and more especially Mittino's, this is what happened. When appellant, Melendes and Buckshot were arrested at the Prize Ring Night Club Mittino rode with them in the patrol wagon to the police station, where they were booked at 3 A. M. and put in cells. The other arresting officers had dispersed looking for others implicated in the robbery. Mittino was the only one with them for the first 20 minutes. He successively took Buckshot, appellant and Melendes out to a little office where there were a table and chairs, close to the desk sergeant's cage, and talked to each of them separately for 5 or 10 minutes, then returning them to their cells. On a second interview appellant confessed to the robbery. Mittino brought Melendes out to the table with appellant, and Melendes confessed. They were at the table about 15 minutes. Officers Hinch and Pratte and maybe Sullivan had come in by that time and were present. Officer Rung and sergeant Abbott came in at 3:25 or 3:30 A. M. after the first confession.

Appellant agreed to show them where Wanita Johnson lived, she being involved in the robbery. Officers Mittino, Rung, Pratte, Hinch and sergeant Abbott took appellant in a police car to the Johnson woman's address. Melendes was put back in his cell. They were gone on that trip 35 or 40 minutes and returned about 4:30 A. M. with the Johnson woman and a man named Kell. Officer Bauer had returned to the police station about then. Melendes was brought into the office. The two prisoners, the six officers and the Johnson woman were there. She confessed in about 15 minutes. Officers Mittino and Rung left to get McCowen, the victim of the robbery, and returned with him and his cousin in 15 or 20 minutes. The four officers, the two prisoners and the woman, whom they had left there, were still at the table. All remained a few minutes until about 5:30 A. M. when Mittino began working on his police report. Appellant, Melendes and the Johnson woman had been put back in their cells.

About that time officer Rung took McCowen home and came back. McCowen claimed he had been robbed of $41. Only $7.60 was found on appellant and Melendes. The latter told Bauer where McCowen's pocket book was hidden in his room at the Savoy Hotel. Mittino was working on his report, taking finger prints, making alibi sheets, etc. Rung and Bauer went after and returned with the pocket book close to 6 A. M. In a few minutes they left to make another arrest in an

unrelated matter and took that prisoner to another police station. They returned to the 11th District station about 7 o'clock. Mittino had completed his report and all left together.

Mittino, Rung and Bauer all swore severally that they did not beat or assault either appellant or Melendes at the police station that morning or see any officer do it. Appellant contends this intercorroboration was insufficient since, according to their own testimony, two of these three officers were away from the station at different times during the period involved, and therefore could not corroborate the ▮▮▮ third, who remained, as to what occurred there during their absence—and no other witnesses were called to bridge those gaps. In so contending, appellant relies on the doctrine[10] that impeachment of the alleged false testimony of an accused in a perjury case must be made by at least two witnesses or one witness and strongly corroborating circumstances.

But officers Mittino, Rung and Bauer all testified substantially that when they severally first saw Melendes he had a black or bruised eye and a swollen or bruised or discolored cheek or chin. Bauer jestingly asked him if he had been hit by a truck. He declined to go to a hospital. And Mittino further declared Melendes looked the same the last time he saw him about 5:30. Rung likewise stated that when he saw Melendes about 4:20 after arresting the Johnson woman the only marks he had were the same ones as when he was arrested. Both said he had been drinking but was not drunk.

All this was enough to corroborate circumstantially Mittino's denial as regards the first 20 minutes after the arrest of the two prisoners, when he was the only officer with them. Indeed, appellant's testimony before the grand jury implicated more than one officer from the beginning; and so do the second and third charges in the information.

And following that first twenty minutes appellant and five of the officers, including Mittino and Rung, were away for 30 to 40 minutes on the trip for the Johnson woman, during which time the assaults on appellant could not have occurred at the police station. When they returned all were together, Bauer having come in about that time. Then, leaving the others—who were still there on their return—Mittino and Rung brought in McCowen and his cousin and the whole group were together. By that time the accomplices and accessory had been identified and the case had been solved, except learning where McCowen's purse was hidden, and the trip for it made by Rung and Bauer. According to the version of these witnesses, with the facts

[10]48 C. J. secs. 167, 168, p. 900, secs. 169, 170, p. 902, sec. 171, p. 903, sec. 173, p. 905; 41 Am. Jur. sec. 67, p. 37; State v. Kaempfer, 342 Mo. 1007, 1010-11(3), 119 S. W. (2d) 294, 296(5); State v. McGee, 341 Mo. 151, 155, 106 S. W. (2d) 480, 482(1), 111 A. L. R. 821, note; State v. Hardiman, supra, 277 Mo. 229, 233, 209 S. W. 879, 880(1).

already developed by the confessions of the culprits, there was no reason for violence thereafter to extort the facts from them. We think the State made a prima facie impeachment of appellant's sworn statements before the grand jury, although it is strange that other available witnesses such as Abbott, Hinch, O'Day and Braudrick, the turnkey, were not used on that issue.

In this connection it should be stated that while the appellant's grand jury testimony, as related by Wells and Rubenstein, was hazy in identifying the asserted perpetrators of the assaults, except Mittino, yet it designated them as police officers and by physical description, which latter well might have fitted Rung. But even if we say it sufficiently identified Mittino alone, the law is settled that where there are several assignments of perjury in an information, substantial proof of any one of them will support a conviction.[11]

There was other corroborating evidence. Ralph S. O'Leary, reporter for the St. Louis Star-Times, testified that on September 29, 1943, appellant told him he had seen Melendes taken out of his cell at the police station five times by Rung, Mittino and Bauer, and each time on his return he showed signs of being beaten up a little more than before; and that on one occasion as Melendes was passing the cell of another prisoner he made a remark following which one of the officers punched him in the solar plexus. This was the only blow appellant saw inflicted on Melendes. He thought the officers had beaten Melendes on the other occasions because they had threatened him. Appellant further stated to O'Leary that he had told an untruth before a number of grand juries and had exaggerated what had happened at the police station, by stating that the officers had beaten Melendes with a blackjack and also beaten him, when in truth the (solar plexus) blow mentioned above was the only one he had seen. Appellant further declared he had told F. B. I. men the same story he was telling the witness.

Likewise, Theodore Schafers, reporter for the St. Louis Globe-Democrat, testified that on September 28, 1943, in the presence of warden Hensley of the city jail, appellant declared the previous stories he had told about seeing Melendes beaten were untrue, except as to the one solar plexus blow above referred to; and that his testimony before every grand jury except the last one was false, his story before the latter being the same as his statement to the F. B. I.

Hubert Small and James Bulman, F. B. I. agents talked to appellant at the city jail on April 24, 1943. Bulman's story contained more detail. They narrated that appellant told them the circumstances of his arrest and incarceration. Mittino, Rung and Bauer took him to the end of the cell block and when he persisted in his

---

[11]48 C. J. sec. 149, p. 889; State v. Day, supra, 100 Mo. 242, 249(6), 12 S. W. 365, 366(5); State v. Gordon, supra, 196 Mo. 185, 201, 95 S. W. 420, 425(12); State v. Jennings, supra, 278 Mo. 544, 552, 213 S. W. 421, 423(7).

denial Mittino struck him in the face with his open palm, twisted his wrist and struck him in the back. Mittino had a pistol in his hand. He confessed and gave the address of the Johnson woman. The three officers took him there but he was mistaken in the address and Mittino again slapped him in the face. Then he recalled the correct address, they got the Johnson woman and Kell, and returned to the main room of the police station.

Melendes was brought in by two uniformed officers. Appellant said Melendes previously had had a black left eye and swollen cheek as a result of a fight between them two days earlier over the Johnson woman, but on this occasion his cheeks seemed a little more swollen, he had a bloody nose and a bleeding right ear. McCowen was brought in, identified the Johnson woman and Melendes confessed. Rung, Mittino and Bauer took him to the front office for a minute or two. Returning, as they passed the Johnson woman's cell Melendes made a remark to her, which Rung had him repeat and then struck him in the stomach with his fist and knocked him down. This solar plexus blow was the only one that appellant saw struck.

Appellant assigns error in the admission of the testimony of these four witnesses on the ground that all of it consisted of contradictory statements and admissions of appellant; that the corpus delicti, the actual perjury, cannot be proven by such admissions alone;[12] and that in this case the corpus delicti was not sufficiently established outside of these admissions, by the testimony of witnesses Wells, Rubenstein, Mittino, Rung and Bauer. Conceding the legal proposition, we must overrule the assignment because, as already ruled in the fifth, sixth and seventh preceding paragraphs, we think the corpus delicti was sufficiently established by the witnesses just named.

The State also presented as a witness Mr. Eggerling, who was foreman of the June, 1943 grand jury, before which, according to the allegations in appellant's supplemental motion to quash the information, he had purged himself of any perjury alleged in the information. Mr. Eggerling testified that appellant appeared before that grand jury, was advised of his rights, signed a written waiver of his constitutional protection, and gave testimony under oath concerning the events which had occurred at the Eleventh District police station on the morning of July 25, 1942. But the trial court sustained his objection to the admission of further testimony from Eggerling along that line on the ground that it was privileged under Sec. 3922 as construed in State v. Caperton, 276 Mo. 314, 318-9, 207 S. W. 795, 796, and three other cases there cited.[13]

[12]48 C. J. secs. 172, 174, p. 905; 41 Am. Jur. sec. 66, p. 36, sec. 69, p. 38; State v. Carter, 315 Mo. 215, 285 S. W. 971.
[13]State v. Thornton, 245 Mo. 436, 440-1, 150 S. W. 1048; State v. Lehman, 175 Mo. 619, 627-9(6), 75 S. W. 139, 142(6); State v. Young, 119 Mo. 495, 516(2), 24 S. W. 1038, 1044-5.

The statute makes the testimony of a witness before a grand jury privileged and the members thereof cannot divulge it in court, with two exceptions. The first is when the question is whether the witness' testimony in court is consistent, or not, with his testimony before the grand jury—and in this case appellant did not testify in court. The second exception is that the testimony before the grand jury may be disclosed "upon a complaint against such person for perjury, or upon his trial for such offense."

Since the State did not and could not appeal, we are not assuming to determine the correctness of the trial court's ruling in favor of the defendant-appellant on the question here involved, which is whether his *voluntary* sworn testimony before a subsequent grand jury is admissible to impeach his alleged perjured testimony before a prior grand jury. But for the sake of future cases we point out that in all four of the decisions cited the question was whether the testimony of the witness before the ▮ grand jury could be divulged when he testified under *compulsion,* or constructively so without advice as to his rights, especially where he was ignorant and without counsel; whereas the State's evidence here shows the appellant was advised of his rights and waived them. See 24 Am. Jur. sec. 50, p. 867, and State v. Conway, 348 Mo. 580, 585-6(6), 154 S. W. (2d) 128, 132(11).

▮ The evidence for the defense showed inconsistencies or contradictions in the testimony of Mittino, Rung and Bauer at the trial and as given in prior depositions. Particularly, it appeared that Rung stated in a deposition he didn't recall any bruises on Mittino when he first saw him. Police photographs of Melendes taken the afternoon after the assaults were introduced but are not brought up in the record. The photographer testified one of them showed blood on his right ear.

Also the deposition of Buckshot, who was arrested with appellant and Melendes, was read. It had been taken on June 10, 1943, in Los Angeles where he was in the Army. Attached thereto was a flashlight photograph of Melendes (not brought up) allegedly taken at the Prize Ring Night Club about 30 minutes before the arrest. Buckshot said it disclosed that Melendes then had only a "mouse" under his left eye—that is a black eye. And there was other evidence to that effect. The defense produced substantial testimony that the date on the envelope containing the original picture, or negative, had been changed from July 25 to July 22, thus making it antedate the arrest by two days. It was contended the police did that while the envelope was in their possession.

Buckshot further testified he was arrested by Mittino and other officers, and that when he, appellant and Melendes were booked at the desk, one of the officers cursed them, demanded to know who was guilty of the robbery, and said if they were taken downstairs and

"worked on" they would be glad to talk. Melendes promptly admitted his guilt and implicated appellant, but exonerated Buckshot, who told officer Mittino he had heard appellant and Melendes talking about splitting some money. The officers took all three prisoners back to cells, or started that way. Buckshot said that "as near as, I can remember, it seems as though I could hear them beating some one, and it sounded like appellant's voice asking them not to hit him." The sound was "dull thuds". He marked on a floor plan of the police station the place from which the sounds came. The floor plan has not been brought up, but we assume it was one of the office and cell room floor, as there is no mention of any stairsteps (to the basement).

Next, he said it "sounded as though they were putting appellant back in his cell." Melendes was then taken from his cell by Mittino and Rung, Bauer looking on, toward an anteroom near the desk. Both officers had blackjacks. Buckshot didn't hear anything but "it seemed to me" they brought him back about an hour later, supported by both officers. His face looked pretty well beaten up, both his eyes were swollen nearly shut, and he was holding one of his hands trying to open and close his fingers. About 4:30 A. M. they transferred appellant to Buckshot's cell where they talked (conversation excluded). Buckshot didn't see Melendes any more that night, but heard him groaning. He said Melendes had not had a fight at the Prize Ring Night Club.

Appellant's theory is that Melendes' death was caused by blows struck with a blackjack or rubber hose filled with shot, which would leave no mark. This theory is based circumstantially on Buckshot's deposition, and on the findings and expert opinion of Drs. Thompson and Harris, pathologists, who performed an autopsy on the corpse on September 25, 1942, two months after the death and six days before appellant testified before the grand jury. They said there were black and blue discolorations and bruises extensively over the scalp, torso, arms and legs, but the skin was not broken; and their conclusion was that the many blows which produced these bruises had caused the death. Dr. Harris estimated some of the bruises on the neck and head were received two or three days before death, and that certain brain injuries (from concussion?) were 18 hours old. Melendes died the second day after the alleged assaults.

As already noted, the deposition of private Buckshot does say Mittino and Rung had blackjacks, and he described the blows he thought he heard struck as "dull thuds." But no other witness said such an instrumentality was used; and the information does not contain any assignment that appellant made that charge before the grand jury. The testimony of Wells and Rubenstein concerning appellant's testimony before the grand jury pretty well followed ▮▮▮ the assignments in the information. But appellant's brief now contends it is

immaterial what instrumentality was used, and that appellant's sworn statements before the grand jury were vindicated by the foregoing circumstantial evidence of the use of a black jack or rubber hose.

Of course, if appellant's testimony was true it was not perjured. But since the first assignment of the information deals with an alleged assault on appellant alone; and the second and third assignments and the supporting evidence of Wells and Rubenstein show appellant specifically swore before the grand jury that a pistol and Mittino's foot (in kicking) were the instrumentalities used in the assaults on him and Melendes; we think the defense of *truth* should be substantially as broad (or narrow) as the charge,[14] or any self-sufficient part thereof. This being a perjury case, appellant's grand jury testimony that he was knocked down and pounded in the face, and knocked out with a pistol, and that he and Melendes both were hit with a pistol and kicked, is not substantiated by circumstantial evidence that Melendes alone suffered wholesale beating with a blackjack—however inhuman and brutal the assaults may have been. The very essence of the crime of perjury is wilful false swearing to a substantially definite material fact. There is more than a material variance in the evidence relied on by appellant here. It rather tends to prove he and Melendes were *not* assaulted in the manner sworn to before the grand jury, but by another more protracted and cunningly concealed method, employing a device which would leave no marks.

Judge Russell testified for the defense. He became interested in the case through affidavits made by appellant and Wanita Johnson, the accessory in the McCowen robbery, and the autopsic report of Dr. Harris. He went to Kansas City and brought Private Buckshot back to St. Louis so that he could testify before the grand jury. He investigated the facts extensively; paroled appellant and was instrumental in obtaining a parole for Wanita Johnson on certain criminal charges; and saw that money was advanced to them; all so that they would not leave the State and would be available as witnesses in the Melendes investigation. He was an aggressive witness at the trial below and among other things said: "The fixers worked twenty-four hours a day during the whole of the September term, 1942, grand jury." Then he added, addressing the assistant circuit attorney: "Your office, the Police Department and the Grand Jury."

The defense offered to read in evidence the deposition of Wanita Johnson (absent from the State), accessory in the robbery of McCowen, taken on December 7, 1942, by Bauer, Mittino and Rung as defendants in a manslaughter prosecution against them for the alleged killing of Melendes, filed November 19, 1942, and dis-

---

[14]41 Am. Jur. sec. 51, p. 28; 48 C. J. sec. 146, p. 888; 37 C. J. sec. 695, p. 154; State v. Frisby, 90 Mo. 530, 2 S. W. 833; State v. Blize, 111 Mo. 464, 471(3), 20 S. W. 210, 212(3); State v. Coyne, 214 Mo. 344, 355, 357, 114 S. W. 8, 10-11, 21 L. R. A. (N. S.) 993.

missed apparently some time in December, 1942. It appears that the original indictment in the instant case had been filed about October 1, 1942 and was pending at the time. The court excluded the deposition because it had been taken in another case with different issues, in which all the parties were not identical. Appellant assigns error in that ruling.

He cites Harrell v. Q., O. & K. C. Rd. Co. (Mo. banc), 186 S. W. 677, a civil action under the wrongful death statute. The widow of the decedent had filed the suit eight months after his death, whereas the statute, Sec. 3652, limited her to six months. Being non-suited, she brought the same devolving cause of action for their minor children as next friend. A deposition taken by the defendant in the first case was held properly used by the plaintiffs in the second. It is evident that there was such clear identity as to parties and causes of action that the decision is not authority here.

Another case cited is Bartlett v. K. C. Pub. Service Co., 349 Mo. 13, 160 S. W. (2d) 740. There the defendant has used two witnesses in a suit brought against it by a husband for loss of his wife's services resulting from personal injuries she had sustained through the defendant's negligence. Thereafter in a suit instituted by the wife against the same defendant for her damages for the same injuries, the defendant used a transcript of the testimony of the two witnesses at the former trial, they being absent from the State. It was held this was proper, although the measure of damages and the party plaintiff in the two suits were different, because: there was an identity of substantive interest in the two plaintiffs; and identity of adversary interest between the respective plaintiffs and the defendant; both plaintiffs had the same counsel, and that counsel had opportunity to cross-examine the two witnesses in the former suit.

In State v. Brown, 331 Mo. 556, 559, 56 S. W. (2d) 405, 407(1), the defendant was convicted of transporting corn whiskey. On a new trial he was charged with unlawful possession of the whiskey. A transcript of the testimony at the first trial of a State's witness since deceased, was held admissible in the second trial. The decision reviews a number of cases where testimony taken in one case was admitted in another, as where: the charge originally was assault with intent to kill and was changed to murder after the victim died; or where the original charge was false pretenses in issuing a promissory note and was changed to uttering a forged promissory note; or where in a larceny case the information predicated ownership of the stolen property in a named person, and in a later case it was predicated in an unknown person (the absent witness not having testified on the issue of ownership); or where the first charge was robbery and the second murder, the homicide having eventuated from the robbery. But a contrary decision is cited in this last instance.

The conclusion reached in this Brown case was that "precise nominal identity of all parties" and "precise technical identity of the charge" are unnecessary; but that the issue—the offense charged—must be substantially the same in both cases, so that the challenged testimony is admissible in both; the testimony must have been under oath; and the adverse party must have had an opportunity to cross-examine.[15]

Here, the case in which Wanita Johnson's deposition was taken was a manslaughter prosecution against Bauer, Mittino and Rung for fatally assaulting Melendes, as the indictment recited, with *pistols*, clubs, rubber hose, blackjacks and other unknown instruments, on the same occasion involved here. The State was the plaintiff, and the three officers were the defendants. They took the deposition. They are not parties to the instant perjury case, though they were defensive witnesses accused by the appellant. But the State, being plaintiff in both cases, had an opportunity to cross-examine Wanita Johnson when her deposition was taken in the other case. And this case was pending at that time.

· The ultimate issue in the present case is whether appellant falsely testified before the grand jury that he was knocked down and pounded in the face, and knocked out with a pistol in a cell; and that he and Melendes were hit with a pistol and kicked in the stomach and ribs; all by Mittino and other unnamed officers. A pistol was one of the instrumentalities allegedly used in both cases—and at the same time and place. The ultimate issue in the other case was whether the assaults with any of the named and unnamed instrumentalities were committed by one or more of the three named officers, and whether they caused Melendes' death. In this case the first of these issues (as to the use of a pistol) is vital, but the second is not. We think the Wanita Johnson deposition was admissible under the holding in the Brown case, supra, and the authorities there cited; and that error was committed in excluding it. We should add, however, that the Brown case was not cited to the trial court.

Having reached that conclusion, we summarize the deposition to show its purport and relevancy to the issues. Wanita Johnson admitted her participation in the McCowen robbery as an accessory before the fact. And she conceded that Mittino, Rung and other officers came to her room about 3:30 A. M. and took her and Kell to the police station where she was confronted with McCowen and confessed her guilt.

But she said that when she first saw Melendes in the office of the police station his face was all black and blue and swollen and his right ear bleeding. All evening the officers had no weapons that she

[15]See also Annotations: 15 A. L. R. p. 524(d); 79 A. L. R. p. 1402(d); 122 A. L. R. p. 430(d).

saw. Melendes was caged about 15 minutes after she was, and was talking and groaning. She saw Melendes taken out of his cell twice by Rung and a gray haired man whose height and weight she estimated at 5 feet, 6 inches and 170 pounds. This description possibly might have fit Bauer, who was 50 years old, but certainly not Mittino, who was 5 feet, 11 inches tall, 34 years old, and weighed 190 pounds. Melendes was gone the first time 15 minutes and the second ██ time 45 minutes. On the second return trip he was staggering and his face was bleeding and swollen to twice the size it was when she first came to the police station. As they passed her cell Melendes said something to her and Rung hit him in the face (not solar plexus) with his fist and knocked him down. He was swollen up and bleeding at the show-up next morning.

This concludes our review of the case on the merits, and the evidence bearing thereon. We think the cause was properly submitted to the jury, though there were conflicts in the testimony on each side, and between the two sides.

██ Next we take up the allegations of the information invoking the habitual criminal statutes, Secs. 4854(2) and 4855; and the evidence in support thereof. The information first alleges appellant's prior conviction in the U. S. District Court of Tennessee on September 28, 1936, of the offense of "forgery (money orders)," and charges the offense would have been a felony punishable by imprisonment in the state penitentiary under the laws of Missouri. It is next alleged that appellant was thereupon sentenced to imprisonment in the U. S. penitentiary at Atlanta, Georgia, for a term of five years, but on May 7, 1941, was transferred to the "Medical Center for Federal Prisoners at Springfield, Missouri," from which he was duly discharged upon lawful compliance with said sentence.

Appellant's most sweeping contention is that the habitual criminal statute, Sec. 4855, does not cover prior convictions in the Federal courts but refers only to convictions in a court of another state of the United States. The question seems to be one of first impression in Missouri. The words of the section are, convictions—"in any of the United States, or in any district or territory thereof, or in a foreign country." The opening phrase of the quoted language undoubtedly does mean, in any of the *several* states, but it also connotes the Union of States and the government thereof, as indicated by the words next following, "or in any district or territory thereof." And these are supplemented by the phrase, "or in any foreign country." Certainly the lawmakers did not intend to exclude the courts of the United States though including those of foreign countries with different and unfamiliar laws. We have found no other statute closely resembling ours, but it is all-comprehensive in scope and the language used is more like that found in several states, "in any other state,

government or country.'' The authorities are gathered in successive annotations in A. L. R.[16] We overrule the assignment.

▮ The next contention is that the allegation in the information designating the prior offense as ''forgery (money orders)'' is unintelligible; and if it does mean anything, charges a plural offense which is only a misdemeanor at best. We do not agree that the charge is unintelligible. It is not an accusation of an unproven crime for which the accused is on trial, but merely a charge of a former conviction already consummated and punished, which is made solely to aggravate the punishment in the pending case. Therefore the rule does not apply to it that nothing can be left to intendment or implication. Such is the doctrine in Missouri though it is sometimes said to be the minority rule in the various jurisdictions of the United States.[17] We think the designation in the information of the prior offense as ''forgery (money orders)'' sufficiently indicates it was forgery *of* money orders.

Neither is the allegation of the prior offense in the instant information plural and duplicitous in any such sense as would debar its use in this case—notwithstanding the words ''money orders'' appear in the plural. This case is clearly distinguishable from State v. Krebs, 336 Mo. 576, 582, 80 S. W. (2d) 196, 199(5), where it was held the three prior offenses there specified were unknown to the law. Here, the alleged prior offense was sufficiently designated and well known. The Federal statute, Sec. 347, Title 18, U. S. C. A. covers both the forgery and the utterance of forged money orders, without regard to the monetary amount thereof. And another statute, Sec. 557, Title 18, U. S. C. A. permits the joinder of ''several'' charges arising out of the same transaction or connected transactions, ▮ or crimes of the same class, in one indictment. Indeed we think appellant is not entitled to raise these questions of mere error in the former conviction.[18]

[17] Nor is the forgery of money orders a misdemeanor. The Federal statute, Sec. 347, supra, fixes the maximum punishment therefor at a fine of $5000 or five years imprisonment, or both. And since 1909, a third statute, Sec. 541, Title 18, U. S. C. A. has provided that all Federal offenses punishable by death or imprisonment for a term exceeding one year shall be deemed felonies. It was held in Ex parte Hibbs, 26 Fed. 421, 431, that the forgery contemplated by Sec. 347,

---

[16]25 Am. Jur. sec. 18, p. 268; 16 C. J. sec. 3156, p. 1341; 24 C. J. S. sec. 1960(d), p. 1151; 58 A. L. R. p. 39(e); 82 A. L. R. p. 357(e); 116 A. L. R. p. 218(3); 132 A. L. R. p. 97(e); 139 A. L. R. p. 679(e).

[17]16 C. J. sec. 3159, p. 1342; 24 C. J. S. sec. 1963, p. 1157; 31 C. J. sec. 283, p. 735; 42 C. J. S. sec. 145(b)(c), pp. 1060-3; State v. Asher (Mo. Div. 2), 246 S. W. 911, 913(3, 4).

[18]16 C. J. sec. 3158, p. 1342; 24 C. J. S. sec. 1961, p. 1156; 31 C. J. sec. 283, p. 736; 42 C. J. S. sec. 145(d), p. 1064; State v. Tyler, 349 Mo. 167, 171(6), 159 S. W. (2d) 777, 780(8).

supra, is common law forgery, as applied to post office money orders. Unquestionably it is "an offense which, if committed in this state, would be punishable by the law of this state by imprisonment in the penitentiary," as required by our statute, Sec. 4855. We have several forgery statutes similar to the Federal statute, such as Sec. 4565, covering the alteration of public warrants or orders for the payment of money, and Sec. 4584 covering the utterance of any forged instrument, covered by the preceding forgery sections. Both are punishable by imprisonment in the penitentiary, Sec. 4594. See State v. Young, 345 Mo. 407, 412(8), 133 S. W. (2d) 404, 408-9.

Appellant further contends the proof to sustain the foregoing allegations was incompetent and insufficient. The State introduced first the indictment under which the appellant was charged in the Federal court. It contained 20 counts and designated the defendant as "Andrew Brinkley, alias 'Bozo'". Counts 1, 3, 5, 7 and 9 charged him with stealing five letters from a rural mail box. Counts 2, 4, 6, 8 and 10 charged him with abstracting from said letters five described U. S. postal money orders. These ten charges were based on Sec. 317, Title 18, U. S. C. A. Counts 11, 13, 15, 17 and 19 charged him with forging material signatures on the money orders. And counts 12, 14, 16, 18 and 20 charged him with uttering said forged money orders. These latter ten charges were based on Sec. 347, supra. The assistant circuit attorney read to the jury only the opening, formal, charging part of the first count, and the factual, substantive part of the last, or 20th count.

Next introduced was the order or judgment of the Federal court showing the arraignment of said defendant; his pleas of guilty to each of the 20 counts; and the respective sentences thereon to a United States penitentiary to be designated by the Attorney General for a term of five years under each of the 20 counts, said sentences to run concurrently. The assistant circuit attorney announced that wherever the words "20 counts" appeared he would read them "10 counts."

The State's effort was, of course, to prove by the indictment and judgment that the appellant had been convicted of forging money orders, as alleged in the information in the instant case. But we think it failed in that effort, and that error was committed. The 20th count of the Federal indictment which alone was read to the jury, was not for forgery but for uttering forged money orders. Following that, the judgment of the Federal court was read as reciting a plea of guilty to ten counts of the indictment and judgment and sentence accordingly. However, the judgment did not state the crime charged in any of the counts, and the reading of it did not even disclose which ten counts were referred to; whereas four different crimes actually were charged in the indictment each being covered by five counts. There were not ten forgery counts, and the one which was read was not for that crime. It was necessary to have one or more of

the forgery counts read in evidence to show the judgment of the Federal court convicted the appellant of forgery. Under the evidence, as read, the jury could not properly have made that finding.

The State argues to the contrary that since the alteration of post office money orders and the subsequent utterance thereof are closely related crimes denounced and identically punished by the same Federal statute, therefore both must be regarded as constituting the same generic crime of forgery—although the statute does not so name them. Then it is pointed out that notwithstanding our state law denounces the alteration of instruments and the utterance of forged instruments by separate statutes,[19] yet the crimes in both instances are denominated ''forgery'' in one degree or another. On this basis it is asserted that the allegation of the instant information charging appellant's conviction in the Federal court of forging money orders, was sustained by reading to the jury a count of the Federal indictment charging only the utterance of forged money orders.

The State's contention finds support in Meeks v. Kaiser, 125 Fed. (2d) 826, 828(5), as to a conviction in our State courts under our own statutes. The information there charged utterance of a forged check, but the judgment and sentence recited that the jury had found the defendant guilty of ''*forgery* as charged in the information.'' The judgment was upheld by the U. S. Circuit Court of Appeals in habeas corpus on the grounds that our Sec. 4584 declares the utterance of a forged check *is* forgery, and that the Legislature had a right thus to brand the crime generically.

But we are concerned here with the Federal rule, not the State rule, for the information here alleges the appellant was convicted in the Federal Court. The Federal statute, Sec. 347, supra, contains no such generic classification as is found in our State statutes. And both the Federal and State decisions,[20] including the Meeks case, supra, declare the crimes of altering and uttering are separate and distinct, may be committed by different persons, and require different proof. The Andrews case, just cited in the margin, holds a defendant cannot be convicted of uttering a forged instrument, under an indictment charging alteration. And the Carragin case rules that counts for both offenses may be joined in the same information, but that the jury can convict of only one offense or the other, not both. That, however, is not because the defendant otherwise would be exposed to double jeopardy: it is because our practice forbids that he be tried

---

[19]As, for instance, Secs. 4565, 4571, 4579, 4591 and Secs. 4572, 4582, 4584.
[20]Reid v. Aderhold, Warden, 65 Fed. (2d) 110, 112(3, 6); McConlogue v. Aderhold, Warden, 56 Fed. (2d) 152, cert. denied 286 U. S. 547, 76 L. Ed. 1284, 52 S. Ct. 501; Read v. U. S., 299 Fed. 918, 921(2), cert. denied, 267 U. S. 596, 69 L. Ed. 805, 45 S. Ct. 352; U. S. v. Carpenter, 151 Fed. 214, 215, 9 L. R. A. (N. S.) 1043, 10 Ann. Cas. 509; Ex parte Peeke, 144 Fed. 1016, 1018; U. S. v. Jones, 69 Fed. 973, 980-2; State v. Andrews, 297 Mo. 281, 288-9, 248 S. W. 967, 969(6); State v. Carragin, 210 Mo. 351, 359 et seq., 109 S. W. 553, 555(1), 16 L. R. A. (N. S.) 561.

and convicted of two *distinct* felonies under one indictment in one trial. Under the Federal statute, Sec. 557 supra, the defendant may be charged, convicted and sentenced cumulatively for both. The Carpenter case held the other way with expressed reluctance before the later Federal cases were decided.

In addition to the foregoing indictment and judgment, the State introduced a certified copy of the record of the Medical Center for Federal prisoners, Springfield, Mo., to which prison the information in this case alleges the appellant was transferred from the U. S. penitentiary at Atlanta, Georgia, and from which he was discharged on completion of his sentence. This record was full of abbreviations. For instance, under the caption "Description of Convict," and the item "Age", these figures appear, "23-1941." Under the item "Offense" are the words and letters, "Stealing U. S. Mail and Forging P. O. M. O." After the item "when received," is the notation "November 5, 1936—USP-A, Atlanta, Ga. May 7, 1941—Med. Cent. Springfield, MO." No record of the Atlanta penitentiary was introduced.

Appellant makes several additional assignments of error based on this Springfield record and the two other exhibits, the Federal indictment and judgment. Since the case must be remanded for retrial, we notice these assignments. It is contended first that none of these three exhibits is properly authenticated. The certificate to the indictment was executed by the *deputy* clerk of the Federal court and authenticated by the judge of the court. The certificate to the order and judgment of the Federal court was executed by the clerk of the court *by* a deputy clerk, and authenticated by the judge of the court. This was sufficient under Secs. 655(8) and 1864 of our statutes. The certificate to the record of the Springfield Medical Center is attested and verified by the affidavit of M. R. King, Warden, as keeper of the records, and authenticated by "J. V. Bennett, Director of the Bureau of Prisons for the Attorney General of the U. S. A." This was more than sufficient under Sec. 1825 of our statutes. State v. Hendrix, 331 Mo. 658, 663(a), 56 S. W. (2d) 76, 79(a).

It is further contended that the Medical Center for Federal Prisoners at Springfield, Missouri, is not a "penitentiary" within the meaning of our habitual criminal statutes, Secs. 4854 and 4855. We hold the contrary. Sec. 753, Title 18, U. S. C. A. creates a Bureau of Prisons, and the office of Director thereof. Sec. 871 provides for the establishment of a hospital for defective delinquents. And Secs. 876 and 879 authorize the Attorney General of the United States to order the transfer of prisoners thereto from other Federal penal institutions; and provide for their discharge upon completion of their sentences. A Washington case[21] has ruled the converse of the

---

[21]State ex rel. Thompson v. Snell, 46 Wash. 327, 332-3, 89 Pac. 931, 933, 9 L. R. A. (N. S.) 1191, 1193.

question at issue here, namely, that a penitentiary may be a hospital for the insane. And it has been recognized in several Federal cases[22] that the Medical Center for Federal Prisoners, Springfield, Missouri, is a penitentiary for certain mentally or physically defective Federal prisoners.

Another contention is that the lack of any authenticated record from the Federal Penitentiary at Atlanta, Georgia, to which appellant was originally sentenced, makes a fatal hiatus in the trial proceedings. We do not think so in view of the record of the Springfield Medical Center showing that appellant was received by that institution *from* the Atlanta penitentiary on May 7, 1941, and was discharged on the expiration of his maximum sentence on May 4, 1942. In other words the *completion* of the sentence at the Medical Center implies the prior part had been served at the Atlanta penitentiary.

In an analogous case, State v. Bailey (Mo. Div. 2), 169 S. W. (2d) 380, 381(3), a record from the Tennessee penitentiary showed the prisoner had escaped in September, 1934, and was discharged in May, 1937. It did not affirmatively show that the prisoner had been returned to the Tennessee penitentiary after his escape. But the decision said the jury had a right to infer that. Here the record more significantly recites appellant was discharged on the date of *expiration* of his maximum sentence. Appellant contends that date, May 4, 1942, was more than five years (the length of his term) after the date of his conviction on September 28, 1936, or even after the date of his reception at the Atlanta penitentiary on November 5, 1936. But that is another matter. The record at least shows he served his full term and was discharged.

Still another contention is that the record of the Springfield Medical Center is unintelligible because of the abbreviations, letters and numerals in it. So far as we know, the Federal law and regulations do not require these prison records to be expanded into formal language free from abbreviations. If they are in fact the records of the institution as customarily kept, that is enough, unless they are fatally defective in what they do say. If the abbreviations cannot be interpreted by the court and jury, the State should produce a qualified witness to explain them.

In particular the appellant complains that none of the records introduced show his age and identity, and that there is no other evidence of these. He urges proof of his age was essential on the theory that without it there would be nothing to show he could be imprisoned in the penitentiary. Sec. 921, Title 18, U. S. C. A. does forbid the confinement of a ''juvenile'' (a person 17 years of

[22]Douglas v. King, 110 Fed. (2d) 911, 127 A. L. R. 1200; Estabrook v. King, 119 Fed. (2d) 607; Kuczynski v. Cox, 141 Fed. (2d) 321.

age or under) in a Federal penitentiary. But Sec. 922 provides an accused shall be prosecuted as a juvenile only in the discretion of the Attorney General and when he, himself, consents. And Sec. 747 declares generally that the place of confinement of a minor shall rest in the judicial discretion of the Federal judge. Evidently that discretion was exercised in this case. And in the absence of a statute to the contrary, a minor offender is subject to the same punishment as an adult.[23]

Appellant makes a further contention, on the theory that under the indictment and proof he may not have been 17 years old when he was convicted of the Federal offense. He maintains that under our statute, Sec. 8998, he could not have been imprisoned in the Missouri penitentiary if he had been convicted of the same offense here; and from that argues his conviction of the Federal offense is not within our habitual criminal statutes, supra. ▇▇▇ Sec. 8998 forbids the imprisonment of a person under 17 years of age in the State penitentiary unless the state crime of which he was convicted carried a statutory minimum punishment of ten years in the penitentiary for persons above that age.

But the corresponding crime in this State would be forging public warrants or orders for the payment of money in violation of Sec. 4565. That is forgery in the first degree, and under Sec. 4594 the minimum punishment *is* ten years' imprisonment in the penitentiary. So if appellant had been convicted of that offense here he could have been imprisoned in the penitentiary under Sec. 8998 even though he then was under 17 years of age. There is no merit in this contention. We have ruled it on the theory that the mere notation "23—1941" under the item "Age", in the record of the Springfield Medical Center may be too indefinite to make a prima facie showing of appellant's age without some explanation.

▇▇▇ As to the appellant's identity, all three records give his name, and the Springfield Record also gives his height, the color of his hair and eyes, and his complexion. That should have assisted materially in identifying him. While not universal,[24] the rule in this State and a number of other jurisdictions is that mere identity of names is prima facie sufficient.[25]

▇▇▇ To prove under the habitual criminal statute, Sec. 4854, appellant's second prior conviction—of larceny from the person of

---

[23]31 C. J. sec. 225, p. 1100; 43 C. J. S. sec. 96, pp. 212, 222; sec. 98, pp. 232, 262; 16 C. J. sec. 3218, p. 1366, sec. 3240, p. 1374; 24 C. J. S. sec. 1989, p. 1212, sec. 2000, p. 1248.

[24]16 C. J. sec. 3165, p. 1345; 24 C. J. S. sec. 1968, p. 1165.

[25]16 C. J. sec. 3162, p. 1344; 24 C. J. S. sec. 1967, p. 1163; sec. 1968, p. 1165, 85 A. L. R. 1101, 1107-13, note; State v. London (Mo. Div. 2), 84 S. W. (2d) 915, 917(3); State v. Stanton (Mo. Div. 2), 68 S. W. (2d) 811, 813(10); State v. Court, 225 Mo. 609, 615, 125 S. W. 451, 452; State v. Payne, 223 Mo. 112, 117, 122 S. W. 1062, 1063(1).

less than $30 under Sec. 4460—as alleged in the information, the State showed by the court record and the testimony of the court clerk, that "Andrew Brinkley" pled guilty to that charge on September 21, 1942, and was sentenced to imprisonment in the St. Louis city work house for a term of five months. The court record, as read, was silent on whether the appellant served that sentence and was discharged. But later the State was permitted, by agreement, to read in evidence a verified letter from the warden of the City Jail, stating the records of his office showed that appellant remained in custody until November 25, 1942, when he was paroled on the larceny conviction.

As will be remembered, the appellant's alleged perjury before the grand jury was committed on October 1, 1942. The parole of November 25 on the larceny charge therefore did not come until 55 days thereafter. He was therefore in custody when he committed the alleged perjury. Appellant's main contention is that these facts did not make a case under Sec. 4854 because that statute requires a discharge from the prior sentence before the commission of the crime for which he is on trial in the habitual criminal case. This contention is correct. Sec. 4854 in speaking of the prerequisites to a habitual criminal prosecution expressly provides (italics ours): "shall be discharged, either upon pardon or compliance with the sentence, and shall subsequently be convicted of any offense *committed after such pardon or discharge.*"

Since the learned Attorney General has intimated in his brief that there may be further records showing appellant's parole from the prior larceny conviction antedated October 1, and questions thereon may arise in event of a retrial, we shall pass briefly on two other assignments of error in appellant's brief. •

He contends first that Sec. 4854 has reference only to such prior offenses as were in contemplation when it was originally passed in substantially the present form, as R. S. 1835, sec. 7, p. 212; and contends larceny from the person of less than $30 in value was unknown in that day as an offense punishable by imprisonment in the penitentiary. This contention is wholly without merit. The habitual criminal statute, Sec. 4854, is not limited to prior convictions punishable by imprisonment in the penitentiary in 1835, but covers offenses since created by statute for which penitentiary punishment was enforceable at the time of conviction. People ex rel. Kruger v. Snyder, 25 N. Y. S. (2d) 644, 645(2).

As we understand, appellant further contends the statute declaring the prior crime must impose penitentiary punishment absolutely, and not merely make it *punishable* that way. Sec. 4460, the larceny statute, supra, fixes the punishment at imprisonment in the penitentiary not exceeding 7 years, or in the county jail not exceeding one year; and defendant in this instance received a jail

sentence of only five months. But the crime is covered by the habitual criminal statute because penitentiary punishment is authorized.[26] In this connection it should be noted that the habitual criminal statute, Sec. 4854, in clause ''second'' thereof does use the word "punished" instead of the word ''punishable'', which appears everywhere else in the section. But this evidently was an inadvertence. The word "punished" first appeared in the amendment of the statute by Laws Mo. 1895, p. 153. But Section 1 of that Act shows its sole purpose was to eliminate the offense of petit larceny therefrom.

Appellant assigns error in the giving of the State's Instruction 6 on the opinions of expert witnesses. It told the jury that while such opinions were proper for their consideration and entitled to such weight as reasonably belonged to them, nevertheless the opinions were ''not binding on you against your own judgment,'' but should be weighed. We think this instruction went too far and should be condemned under such cases as Scanlon v. Kansas City, 325. Mo. 125, 148, 28 S. W. (2d) 84, 94; Phares v. Century Elec. Co., 336 Mo. 961, 967(3), 82 S. W. (2d) 91, 94(7, 8); and State v. Willard, 346 Mo. 773, 783, 142 S. W. (2d) 1046, 1052(15).

In instructing on the necessity of proving the falsity of the appellant's perjured testimony either by two credible witnesss or by one witness and strongly corroborating evidence, the State's instructions Nos. 2 and 3 did not use the adverb ''strongly.'' And appellant assigns error on that omission. The instruction in our Kaempfer and McGee cases, cited in marginal note 10, did use that word. And there are earlier Missouri cases, and others from other jurisdictions, holding an extraordinary degree of proof is required; though an increasing number of states have receded from the ancient and ''modern'' rules, and hold a conviction of perjury may rest on circumstantial evidence alone.[27] In our opinion it is enough to tell the jury the State must impeach the alleged perjured testimony in the manner first stated above, and to require a finding on the issue beyond a reasonable doubt, without using expletives and intensives. We think the two instructions were correct.

Appellant further assigns error in the overruling of his motion to inspect the minutes or notes of the September, 1942 and June, 1943 grand juries. The former was the one before which he committed the alleged perjury; the latter, the one before which he made the retraction alleged in his supplemental motion to quash the information. He professes no ignorance as to what he said before the latter grand jury, and the testimony as to what he then said was

[26]State v. Marshall, 326 Mo. 1141, 1144(1), 34 S. W. (2d) 29, 30-1(1, 2); State v. Stiff, 148 Kan. 457, 83 Pac. (2d) 424 and cases cited under Note II b 1 in the A. L. R. Annotations cited in marginal note 15.

[27]Annotations in 15 A. L. R. p. 634; 27 A. L. R. p. 867; 42 A. L. R. p. 1063; 111 A. L. R. p. 825.

excluded anyway. But the testimony of the two June, 1942 grand jurors as to appellant's sworn testimony before them was the foundation of the State's case. Their memories were somewhat faulty. The court had a discretion, State v. Pierson, 343 Mo. 841, 851(3), 123 S. W. (2d) 149, 152(4). In its reasonable exercise the court might have permitted appellant to examine the grand jury notes covering his own testimony.

We have not encountered a record where there was a more wanton disregard of the rules of evidence than appellant's counsel was guilty of. The opinions of counsel were volunteered. Personal comments were made concerning opposing counsel, and questions were asked which called for evidence that was plainly hearsay or otherwise incompetent and immaterial. In some instances after an objection thereto had been sustained an offer of proof was made in the presence of the jury. The trial was impeded thereby and the record greatly extended. While the conduct of a trial rests largely in the discretion of the judge, and considerable latitude should be allowed the attorneys for the litigants in view of the hurried approximations they must make in offering or objecting to evidence, yet there is a limit beyond which they should not be permitted to go.

We shall not review the many other assignments, which are procedural and probably will not recur on another trial. For error: in the exclusion of the deposition of Wanita Johnson; insufficiency of the State's proof of appellant's prior conviction of the Federal offense of forging post office money orders; incompetency of the evidence of appellant's prior conviction of the crime of larceny from the person; and in giving of the State's instruction No. 6 on expert witnesses; the judgment is reversed and the cause remanded. All concur.